**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| JAMES KELLY, individually and on behalf of L.K., his minor child, and on behalf of all other similarly situated, | Case No. _____ |
| Plaintiffs, | Class Action |
| v. | Jury Demand |
| Young Consulting, LLC, | |
| Defendant. | |

## <u>CLASS ACTION COMPLAINT</u>

Plaintiff James Kelly, on behalf of himself, his minor child L.K., and all others similarly situated ("Plaintiff" or "Kelly"), brings this action against Defendant, Young Consulting, LLC ("Defendant" or "Young Consulting") based on personal knowledge, on the investigation of her counsel, and on information and belief as to all other matters:

## INTRODUCTION

1.      This is a civil action seeking monetary damages and injunctive relief from Defendant Young Consulting, arising from its failure to safeguard certain

personally identifying information[1] ("PII") and protected health information ("PHI") (collectively, "Private Information") of at least 954,177 of customers of its clients, including their names, Social Security numbers, dates of birth, and insurance policy and claim information.[2]

2.      Young Consulting is a health technology company providing software-as-a-service solutions to healthcare providers.

3.      On or about April 13, 2024, Young Consulting became aware of some technical difficulties in its information systems. This alerted Young Consulting to the fact that hackers had gained access to its information systems.

4.      As is evidenced by the fact that Young Consulting did not identify any malicious activity until its systems started going offline due to the ransomware event, Young Consulting failed to implement reasonable, industry standard cybersecurity safeguards necessary to protect against these imminently foreseeable cyber events, including the standard and commonly used logging, monitoring, and alerts tools that would have allowed Young Consulting to identify malicious activity before it was

---

[1] The Federal Trade Commission defines "personally identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 17 C.F.R. § 248.201(b)(8). To be clear, according to Defendant, not every type of information included in that definition was compromised in the breach.

[2] https://youngconsulting.com/notice/youngconsulting-notice.html.

too late to prevent the exfiltration of Plaintiff's and Class Members' Private Information.

5.    As technology company that operates in the healthcare sector, Defendant either did, or certainly should have, understood the risk of harm to Plaintiff and the proposed Class of its failure to implement reasonable cybersecurity measures.

## PARTIES

6.    Plaintiff James Kelly is a natural person and a resident and citizen of Shelburne, Vermont, where he intends to remain.

7.    Plaintiff L.K. is James Kelly's minor child, and also resides in Shelburne, Vermont.

8.    Defendant Young Consulting, LLC is a Georgia corporation with its principal place of business at 180 Interstate North Parkway SE, Suite 400, Atlanta, Georgia, 30339.[3] Defendant may be served through its Registered Agent, C T Corporation System, 289 South Culver Street, Lawrenceville, GA 30046.

9.    Defendant Young Consulting, LLC is "the market leader in providing software solutions to the employer stop loss marketplace" and claims to "develop integrated software solutions for the marketing, underwriting and administering of

---

[3] Defendant also lists this location as its main office. https://www.youngconsulting.com/contact.

medical stop loss insurance for carriers, brokers and third party administrators."[4]

## JURISDICTION AND VENUE

10.     Jurisdiction is proper in this Court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because: (i) there are more than one hundred (100) Class Members; (ii) the aggregate amount in controversy exceeds five million dollars ($5,000,000.00), exclusive of interest and costs; and (iii) some Class Members are citizens of states different than Defendant.

11.     This Court has personal jurisdiction over Defendant because it regularly and systematically transacts business in the State of Georgia, such that it can reasonably anticipate defending a lawsuit here. Moreover, this Court has jurisdiction over Defendant because its acts and omissions effected Plaintiff's property interests within the state of Georgia.

12.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to these claims occurred in this district, and/or or a substantial part of property that is the subject of this action is situated herein.

---

[4] https://www.youngconsulting.com.

# FACTUAL ALLEGATIONS

***The Data Breach***

13.    On or about April 13, 2024, Young Consulting began experiencing technical difficulties in its information systems. After investigating these difficulties, Defendant realized it had experienced a ransomware event, which is a cyberattack in which malicious hackers encrypt a company's information systems and usually is performed after the hackers have already stolen any data they deemed valuable.

14.    Because Defendant did not know its systems had been breached until the ransomware event, it almost certainly failed to implement the necessary logging, monitoring, and alerting systems necessary to identify malicious cyber activity.

15.    In May 2024, the BlackSuit cybergang claimed credit and said it stole Defendant's business, employee, and financial data files, among others.[5]

16.    BlackSuit then posted an advertisement online stating the Young Consulting had seventy-two hours to pay a ransom or the data would be released to the public.[6]

---

[5] Ionut Arghire, *950,000 Impacted by Young Consulting Data Breach*, SECURITYWEEK (Aug. 28, 2024), https://www.securityweek.com/950000-impacted-by-young-consulting-data-breach.
[6] *Id.*



17.     BlackSuit has reportedly since made the data public available.[7]

18.     Indeed, the "data appears to have been post publicly, as the gang provides two links to it."[8]

19.     In the wake of the Data Breach, Defendant claims to have taken immediate action and launched an investigation. Exhibit A. Notwithstanding this purported immediate action, Defendant took more than four months to notify

---

[7] *Id.*; Bill Toulas, *BlackSuit Ransomware Stole Data of 950,000 from Software Vendor* (Aug. 27, 2024), https://www.bleepingcomputer.com/news/security/blacksuit-ransomware-stole-data-of-950-000-from-software-vendor.

[8] Ernestas Naprys, *Almost A Million Affected by Young Consulting Data Breach, BlackSuit Ransomware Claims Responsibility*, CYBERNEWS (Aug. 28, 2024), https://cybernews.com/security/million-affected-by-young-consulting-breach-by-blacksuit-ransomware.

Plaintiff and the proposed Class Members of the Data Breach, even though Defendant is statutorily required to give notice to affected individuals "in the most expedient time possible and without unreasonable delay."[9]

20.    Four months does not qualify as the most expedient time possible and is instead an unreasonable delay, given that the average timeline for states in which a black-letter deadline is provided is between thirty and sixty days.

21.    Email phishing schemes "remain[] the primary attack vector for nine out of 10 cyberattacks."[10] Defendant did not elaborate on how the Data Breach happened but because "91% of ransomware attacks are the result of phishing exploits" in the healthcare sector, it is more than plausible that the Data Breach was due to a phishing attack as well.[11]

22.    Companies can mount two primary defenses to phishing scams: employee education and technical security barriers.

23.    Employee education is the process of adequately making employees aware of common phishing attacks and implementing company-wide policies

---

[9] Ga. Code Ann. § 10-1-912(a).
[10] Benishti, Eyal, *How to Safeguard Hospital Data from Email Spoofing Attacks*, INSIDE DIGITAL HEALTH, (Apr. 4, 2019), https://www.idigitalhealth.com/news/how-to-safeguard-hospital-data-from-email-spoofing-attacks.
[11] *Security Report Health Care – Hospitals, Providers and more*, CORVUS INSURANCE 2 (Mar. 3, 2020), https://info.corvusinsurance.com/hubfs/Security%20Report%202.2%20-%20Health%20Care%20.pdf.

requiring the request or transfer of sensitive personal or financial information only through secure sources to known recipients. Employee education and secure file-transfer protocols provide the easiest method to assist employees in properly identifying fraudulent e-mails and preventing unauthorized access to PII.

24.    From a technical perspective, companies can also greatly reduce the flow of phishing e-mails by implementing certain security measures governing e-mail transmissions. Companies can use a simple email validation system that allows domain owners to publish a list of IP addresses that are authorized to send emails on their behalf to reduce the amount of spam and fraud by making it much harder for malicious senders to disguise their identities. Companies can also use email authentication that blocks email streams that have not been properly authenticated.

25.    Moreover, because Defendant's post-breach response was so woefully delayed, Defendant likely did not have a sufficient, industry standard cybersecurity incident response plan in place or otherwise had such poor systems in place that it could not reconstruct what happened on its own systems in a timely manner.

26.    When Plaintiff received the notification letters for him and his minor children, he reviewed them and heeded the letters' instructions to be "vigilant by reviewing account statements, monitoring free credit reports" and other tasks.

Indeed, Defendant included these instructions in its online notice as well.[12]

27.    Moreover, Plaintiff called the call center identified by Defendant to learn more about the Data Breach, but it was operated by TransUnion, who was unable to give Plaintiff any useful information.

28.    The time Plaintiff has spent is a monetary injury in that Plaintiff spent this time at Defendant's direction and because of Defendant's Data Breach.

29.    Because Defendant's failures caused his Private Information to fall into the hands of sophisticated identity thieves, he has suffered anxiety and stress because of the uncertainty of the harm he must now face for years to come.

30.    This anxiety and stress has been significantly amplified because the breach has affected his minor child L.K., as well as his other children, whose Private Information is now in the hands of nefarious cybercriminals and fraudsters, including their Social Security numbers and dates of birth.

***The Data Breach was Foreseeable***

31.    Every company that collects Private Information has a duty to protect against the harms inherent in data breaches because such events are imminently foreseeable given the frequency with which they occur.

32.    Indeed, the FBI warned earlier this year of the specific threat from

---

[12] https://youngconsulting.com/notice/youngconsulting-notice.html.

BlackSuit.

33.     Recently, the FBI and CISA warned that the notorious Royal threat group had rebranded as BlackSuit and had become increasingly active in its attacks against "commercial facilities, healthcare and public health, government facilities, and critical manufacturing."[13]

34.      The warning was not new, however, as the government had warned last year that "Royal, one of the most active ransomware gangs in recent years, [was] preparing to rebrand or spin off with a new name, BlackSuit."[14]

35.     Beyond the public notices regarding the threat of BlackSuit and Royal, the harm from data breaches and cyberattacks is imminently foreseeable due to the significant number of such attacks in recent years.

36.     Indeed, data breaches have become alarmingly commonplace. In 2016, the number of data breaches in the U.S. exceeded 1,000, a 40% increase from 2015.[15]

---

[13] Cybersecurity and Infrastructure Security Agency, *Royal Ransomware Actors Rebrand as "BlackSuit," FBI and CISA Release Update to Advisory* (Aug. 7, 2024), https://www.cisa.gov/news-events/alerts/2024/08/07/royal-ransomware-actors-rebrand-blacksuit-fbi-and-cisa-release-update-advisory.

[14] Zack Whittaker, *US Says Royal Ransomware Gang Plans 'Blacksuit" Rebrand*, TECHCRUNCH (Nov. 15, 2023), https://techcrunch.com/2023/11/15/cisa-fbi-royal-ransomware-blacksuit-sanctions.

[15] Identity Theft Res. Ctr., *Data Breaches Increase 40 Percent in 2016, Finds New Report from Identity Theft Resource Center and CyberScout* (Jan. 19, 2017), https://www.idtheftcenter.org/data-breaches-increase-40-percent-in-2016-finds-new-report-from-identity-theft-resource-center-and-cyberscout.

The next year, that number increased by nearly 50%.[16] The following year the healthcare sector was the second easiest "mark" among all major sectors and categorically had the most widespread exposure per data breach.[17]

***The Data Stolen Is Valuable and Highly Sensitive***

37.    Though Defendant only admitted that the stolen data included names, Social Security numbers, dates of birth, and insurance and claims information, the data likely includes even more information, as BlackSuit has claimed that it includes

38.    The Private Information stolen in the Data Breach is significantly more valuable than the loss of, say, credit card information in a large retailer data breach. Victims affected by those retailer breaches could avoid much of the potential future harm by simply cancelling credit or debit cards and obtaining replacements. The information stolen in the Data Breach— most notably names and Social Security Numbers—is difficult, if not impossible, to change.

39.    This kind of data, as one would expect, demands a much higher price on the dark web. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable

---

[16] Identity Theft Res. Ctr., *2017 Annual Data Breach Year-End Review* (Jan. 25, 2018), https://www.idtheftcenter.org/images/breach/2017Breaches/2017AnnualDataBreachYearEndReview.pdf.
[17] Identity Theft Res. Ctr., *2018 End-of-Year Data Breach Report* (Feb. 20, 2019), https://www.idtheftcenter.org/wp-content/uploads/2019/02/ITRC_2018-End-of-Year-Aftermath_FINAL_V2_combinedWEB.pdf.

information… [is] worth more than 10x on the black market."[18]

40.    PII data for sale is so valuable because PII is so broad, and it can therefore be used for a wide variety of criminal activity such as creating fake IDs, buying medical equipment and drugs that can be resold on the street, or combining PII with false provider numbers to file fake claims with insurers.

41.    The value of Plaintiff's PII on the black market is considerable. Stolen PII trades on the black market for years. Beyond posting the data online, which has already happened here, cybercriminals trade stolen information through encrypted channels on the Telegram and/or Signal applications so that they can further profit off Plaintiff's data and further perpetrate identity theft and fraud.

### Defendant Failed to Adhere to FTC Guidelines

42.    According to the Federal Trade Commission("FTC"), the need for data security should be factored into all business decision-making.[19] To that end, the FTC has issued numerous guidelines identifying best data security practices that businesses, such as Defendant, should employ to protect against the unlawful exposure of Personal Information.

---

[18] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers* (Feb. 6, 2015), https://www.networkworld.com/article/935334/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

[19] Fed. Trade Comm'n, *Start with Security: A Guide for Business* (Sept. 2, 2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.

43.    In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established guidelines for fundamental data security principles and practices for business.[20] The guidelines explain that businesses should:

      a.    protect the personal information that they keep;

      b.    properly dispose of personal information that is no longer needed;

      c.    encrypt information stored on computer networks;

      d.    understand their network's vulnerabilities; and

      e.    implement policies to correct security problems.

The guidelines also recommend that businesses watch for large amounts of data being transmitted from the system and have a response plan ready in the event of a breach.

44.    The FTC recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party

---

[20] Fed. Trade Comm'n, *Protecting Personal Information: A Guide for Business* (Sept. 28, 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

service providers have implemented reasonable security measures.[21]

45.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect PII, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

46.    Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to patient PII constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

***Defendant Failed to Adhere to Industry Standards***

47.    As stated above, the healthcare industry continues to be a high value target among cybercriminals. In 2017, the U.S. healthcare sector experienced over 330 data breaches, a number which continued to grow in 2018 (363 breaches). The costs of healthcare data breaches are among the highest across all industries, topping $380 per stolen record in 2017 as compared to the global average of $141 per

---

[21] *See Start with Security, supra* note 18.

record.[22] As a result, both the government and private sector have developed industry best standards to address this growing problem.

48.    The United States Department of Health and Human Services' Office for Civil Rights ("DHHS") notes that, "[w]hile all organizations need to implement policies, procedures, and technical solutions to make it harder for hackers to gain access to their systems and data, this is especially important in the healthcare industry. Hackers are actively targeting healthcare organizations as they store large quantities of highly sensitive and valuable data."[23] DHHS highlights "several basic cybersecurity safeguards that can be implemented to improve cyber resilience which only require a relatively small financial investment, yet they can have a major impact on an organization's cybersecurity posture."[24] Most notably, organizations must properly encrypt PII to mitigate against misuse.

49.    The private sector has similarly identified the healthcare sector as particularly vulnerable to cyber-attacks both because of the of value of the PII that it maintains and because, as an industry, it has been slow to adapt and respond to

---

[22] *Id.*
[23] *Cybersecurity Best Practices for Healthcare Organizations*, HIPAA JOURNAL (Nov. 1, 2018), https://www.hipaajournal.com/important-cybersecurity-best-practices-for-healthcare-organizations/.
[24] *Id.*

cybersecurity threats.[25]

50.    Defendant failed to adequately train its employees on even the most basic of cybersecurity protocols, including:

a.    How to detect phishing emails and other scams including providing employees examples of these scams and guidance on how to verify if emails are legitimate;

b.    Effective password management and encryption protocols for internal and external emails;

c.    Avoidance of responding to emails that are suspicious or from unknown sources;

d.    Locking, encrypting and limiting access to computers and files containing sensitive information; and

e.    Implementing guidelines for maintaining and communicating sensitive data.

51.    Defendant's failure to implement these rudimentary measures made it an easy target for the Data Breach that came to pass.

---

[25] *10 Cyber Security Best Practices for the Healthcare Industry*, NTIVA (Jun. 19, 2018), https://www.ntiva.com/blog/10-cybersecurity-best-practices-for-the-healthcare-industry.

***Defendant Failed to Comply with its HIPAA Obligations***

52.     As a business associate of its clients, Defendant is also a covered entity of its clients and is required to comply with the cybersecurity requirements set forth in the Health Insurance Portability and Accountability Act.

53.     HIPAA's implement regulations provide security provisions and data privacy responsibilities designed to keep medical information safe.

54.     HIPAA provides specific privacy rules that require comprehensive administrative, physical, and technical safeguards to ensure the confidentiality, integrity, and security of Private Information is properly maintained.

55.     The Data Breach itself resulted from a combination of inadequacies showing Defendant failed to comply with safeguards mandated by HIPAA. Defendant's security failures include, but are not limited to:

       a.     Failing to ensure the confidentiality and integrity of electronic PHI that it creates, receives, maintains, and transmits in violation of 45 C.F.R. § 164.306(a)(1);

       b.     Failing to protect against any reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

       c.     Failing to protect against any reasonably anticipated uses or

disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

d.      Failing to ensure compliance with HIPAA security standards by Defendant's workforce in violation of 45 C.F.R. § 164.306(a)(4);

e.      Failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

f.      Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. § 164.308(a)(1);

g.      Failing to identify and respond to suspected or known security incidents and failing to mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity in violation of 45 C.F.R. § 164.308(a)(6)(ii);

h.      Failing to effectively train all staff members on the policies and procedures with respect to PHI as necessary and appropriate for staff members to carry out their functions and to maintain security of PHI in

violation of 45 C.F.R. § 164.530(b) and 45 C.F.R. § 164.308(a)(5); and

i.     Failing to design, implement, and enforce policies and procedures establishing physical and administrative safeguards to reasonably safeguard PHI, in compliance with 45 C.F.R. § 164.530(c).

56.    Simply put, the Data Breach resulted from a combination of insufficiencies that demonstrated Defendant failed to comply with safeguards mandated by HIPAA regulations.

***Plaintiff and the Class Members Were Significantly Injured by the Data Breach***

57.    As a result of Defendant's failure to prevent the Data Breach, Plaintiff and the Class Members have suffered and will continue to suffer significant injury and damages. They have suffered or are at increased risk of suffering:

a.     Misuse of Private Information and fraudulent applications, which has already occurred in the form of the data being posted online;

b.     Decrease in credit scores;

c.     The loss of the opportunity to control how Plaintiff's and the Class Members' Private Information is used;

d.     The compromise, publication and/or theft of their Private Information, which has already occurred;

e.    Out-of-pocket costs associated with the prevention, detection, recovery and remediation from identity theft or fraud, including the purchase of identity theft protection insurance and detection services;

f.    Lost opportunity costs and lost wages associated with the time and effort expended and the loss of productivity from addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest and recover from identity theft and fraud;

g.    Lost time spent setting right the harms caused by identity thieves and fraudsters;

h.    Delay in receipt of tax refund monies;

i.    Unauthorized use of stolen Private Information;

j.    The continued risk to their Private Information, which remains in the possession of Defendant and is subject to further breaches so long as it fails to undertake appropriate measures to protect the Private Information in their possession; and

k.    Current and future costs related to the time, effort, and money

that will be expended to prevent, detect, contest, remediate and

repair the impact of the Data Breach for the remainder of the lives

of Plaintiff and Class Members.

58.     Because of the Data Breach, Plaintiff and the Class Members now face, and will continue to face, a heightened risk of identity theft and fraud for the rest of their lives, especially because their Social Security numbers have been posted online and shared among the public and members of the identity thief underworld.

59.     As a tech company whose services the healthcare industry, Defendant knew or should have known the importance of safeguarding Private Information entrusted to it and of the foreseeable consequences of a breach. Despite this knowledge, however, Defendant failed to undertake adequate cybersecurity measures to prevent the Data Breach email attack from happening.

60.     Although Defendant has offered affected victims limited credit monitoring and identity protection services, the offer is woefully insufficient to adequately protect Plaintiff the Class Members for the injuries and damages resulting from the Data Breach, which they will now face long after the limited credit monitoring Defendant offered has expired.

61.     Indeed, identity thieves often wait more than a year to perpetrate their crimes against data breach victims because they know that companies rarely offer

more than a year or two of monitoring services.

## CLASS ACTION ALLEGATIONS

62.     Plaintiff brings this action on behalf of himself, his minor child, and all others similarly situated pursuant to Fed. R. Civ. Proc. 23. The Class is preliminarily defined as:

> All individuals whose Personal Information was compromised because of the Data Breach with Defendant and who received a Data Breach notification letter.

63.     Excluded from the Class are Defendant and its subsidiaries and affiliates, officers, directors, and members of their immediate families, and any entity in which it has a controlling interest, the legal representatives, heirs, successors or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

64.     Plaintiff reserves the right to modify or amend the definition of the proposed Class and/or to add a subclass(es) if necessary, before this Court determines whether certification is appropriate.

65.     *Fed. R. Civ. Proc. 23(a)(1) Numerosity:* The Class is so numerous such that joinder of all Members is impracticable. Upon information and belief, and subject to class discovery, the Class consists of nearly a million customers of Defendant's clients, the identity of whom are within the exclusive knowledge of and

can be ascertained only by resort to Defendant's records. Defendant has the administrative capability through its computer systems and other records to identify all Members of the Class, and such specific information is not otherwise available to Plaintiff.

66.    *Fed. R. Civ. Proc. 23(a)(2) Commonality and Fed. R. Civ. Proc. 23(b)(3) Predominance:* There are numerous questions of law and fact common to the Class. As such, there is a well-defined community of interest among the Members of the Class. These questions predominate over questions that may affect only individual Members of the Class because Defendant has acted on grounds generally applicable to the Class. Such common legal or factual questions include, but are not limited to:

   a.    Whether Defendant had a duty to protect employee Private Information;

   b.    Whether Defendant knew or should have known of the susceptibility of its systems to a data breach;

   c.    Whether Defendant's security measures to protect its systems were reasonable considering best practices recommended by data security experts;

   d.    Whether Defendant was negligent in failing to implement

reasonable and adequate security procedures and practices;

e.    Whether Defendant's failure to implement adequate data security measures allowed the Data Breach to occur;

f.    Whether Defendant's conduct, including its failure to act, resulted in or was the proximate cause of the Data Breach, resulting in the unlawful exposure of the Plaintiff's and Class Members' Private Information;

g.    Whether Plaintiff and Class Members were injured and suffered damages or other losses because of Defendant's failure to reasonably protect its systems and data network;

h.    Whether Plaintiff and Class Members are entitled to relief;

i.    Whether Defendant failed to adequately notify Class Members of the compromise of their Private Information;

j.    Whether Defendant assumed a fiduciary duty and/or confidential relationship to Class Members when they entrusted it with their Private Information;

k.    Whether Defendant breached its contracts with Class Members by failing to properly safeguard their Private Information and by failing to notify them of the Data Breach;

l.      Whether Defendant's violation of FTC and HIPAA regulations constitutes evidence of negligence or negligence *per se*;

m.     Whether Defendant impliedly warranted to Class Members that the information technology systems were fit for the purpose intended, namely the safe and secure processing of Personal Information, and whether such warranty was breached.

67.     *Fed. R. Civ. Proc. 23(a)(3) Typicality:* Plaintiff's claims are typical of the claims of all Class Members, because all such claims arise from the same set of facts regarding Defendant's failures:

a.      to protect Plaintiff's and Class Members' Private Information;

b.      to discover and remediate the security breach of its computer systems more quickly; and

c.      to disclose to Plaintiff and Class Members in a complete and timely manner information concerning the security breach and the theft of their Private Information.

68.     *Fed. R. Civ. Proc. 23(a)(4) Adequacy:* Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff is a more than adequate representative of the Class in that Plaintiff is a victim of the Data Breach, has suffered injury and damages such as misuse and fraudulent activity because of the

Data Breach, and brings the same claims on behalf of herself and the putative Class. Plaintiff has no interests antagonistic to that of the Class Members. Plaintiff has retained counsel who are competent and experienced in litigating class actions, including class actions following data breaches and unauthorized data disclosures. Plaintiff intends to vigorously prosecute this case and will fairly and adequately protect the Class's interests.

69.     *Fed. R. Civ. Proc. 23(b)(2) Injunctive and Declaratory Relief:* Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

70.     *Fed. R. Civ. Proc. 23(b)(3) Superiority:* It is impracticable to bring Class Members' individual claims before the Court. Class treatment permits many similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort, expense, or the possibility of inconsistent or contradictory judgments that numerous individual actions would engender. The benefits of the class mechanism, including providing injured persons or entities with a method for obtaining redress on claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

71.    A class action is superior to the other available methods for the fair and efficient adjudication of this controversy because:

      a.    The unnamed Members of the Class are unlikely to have an interest in individually controlling the prosecution of separate actions;

      b.    Concentrating the litigation of the claims in one forum is desirable;

      c.    Plaintiff anticipates no difficulty in the management of this litigation as a class action; and

      d.    Plaintiff's legal counsel has the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

72.    Plaintiff knows of no unique difficulty to be encountered in the prosecution of this action that would preclude its maintenance as a class action.

73.    *Fed. R. Civ. Proc. 23(c)(4) Issue Certification:* Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such issues include, but are not limited to:

a. Whether Defendant owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing and safeguarding their Private Information;

b. Whether Defendant's security measures to protect its data systems were reasonable considering best practices recommended by data security experts;

c. Whether Defendant's failure to institute adequate protective security measures amounted to negligence;

d. Whether Defendant failed to take commercially reasonable steps to safeguard prospective employee and employee Personal Information; and

e. Whether adherence to FTC data security recommendations, and industry standards on data security would have reasonably prevented the Data Breach.

74. Finally, all Members of the proposed Class are readily ascertainable. Defendant has access to the names and addresses of all individuals it notified of the Data Breach.

### COUNT I
### NEGLIGENCE AND NEGLIGENCE PER SE
### (on behalf of Plaintiffs and the Class)

75.     Plaintiff incorporates and realleges the above allegations as if fully set forth herein.

76.     Defendant owed a duty to Plaintiff and the Members of the Class to exercise reasonable care to safeguard their Private Information in its possession, based on the foreseeable risk of a data breach and the resulting exposure of their information, as well as on account of the special relationship between Defendant and its employees, including implementing industry-standard security procedures sufficient to reasonably protect the information from the Data Breach, theft, and unauthorized use that came to pass, and to promptly detect attempts at unauthorized access.

77.     Defendant also owed a duty to Plaintiff and the Class as defined in Section 5 of the FTC Act and HIPAA's implementing regulations. Failure to comply with these regulatory and statutory frameworks constitutes negligence per se, and in the alternative at least inform the standard of care.

78.     Defendant acted with wanton and reckless disregard for the security and confidentiality of Plaintiff's and Members of the Class's Private Information by disclosing and providing access to this information to third parties and by failing to

- 29 -

properly supervise both the manner in which the information was stored, used, and exchanged, and those in its employ who were responsible for making that happen.

79.    Indeed, Defendant's failures to implement basic, industry standard and regulatorily required cybersecurity safeguards—like appropriate incident response plans and logging, monitoring, and alerting capabilities—directly led to Plaintiff's and the Class's Private Information being disclosed to cybercriminals, other identity thieves, and the public at large.

80.    Further, Defendant owed to Plaintiff and Members of the Class a duty to notify them within a reasonable time frame of any breach to the security of their Private Information. Defendant also owed a duty to timely and accurately disclose to Plaintiff and Members of the Class the scope, nature, and occurrence of the Data Breach. This duty is required and necessary for Plaintiff and Members of the Class to take appropriate measures to protect their Personal Information, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the Data Breach.

81.    Defendant owed these duties to Plaintiff and Members of the Class because they are Members of a well-defined, foreseeable, and probable class of individuals who Defendant knew or should have known would suffer injury-in-fact from Defendant's inadequate security protocols. Defendant actively sought and

obtained Plaintiff's and Members of the Class's Private Information for its own gain.

82.    Plaintiff and Members of the Class were required to provide their Private Information to Defendant because of Defendant's relationship as a service provider of its clients, and Defendant retained that information.

83.    The risk that unauthorized persons would attempt to gain access to the Private Information and misuse it was foreseeable. Given that Defendant holds vast amounts of this information, it was inevitable that unauthorized individuals would attempt to access Defendant's information systems containing the Private Information, whether by email hacking attack, or otherwise.

84.    Private Information is highly valuable, and Defendant knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the Private Information of Plaintiff and Members of the Class, and the importance of exercising reasonable care in handling it.

85.    Defendant breached its duties by failing to exercise reasonable care in supervising its employees and agents, and in handling and securing the Private Information and Private Information of Plaintiff and Members of the Class which actually and proximately caused the Data Breach and Plaintiff's and Members of the Class's injury. Defendant further breached its duties by failing to provide reasonably timely notice of the Data Breach to Plaintiff and Members of the Class, which

actually and proximately caused and exacerbated the harm from the Data Breach and Plaintiff's and Members of the Class's injuries in fact.

86.    The harm that has occurred in the Data Breach is the type of harm the FTC Act's prohibition of unfair and deceptive acts and practices is intended to guard against. Indeed, the FTC has pursued numerous enforcement actions against businesses that, because of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and the Class Members.

87.    Likewise, HIPAA regulations are designed to protect patient information and to ensure that covered entities implement reasonable cybersecurity measures to mitigate the risk of harm associated with the breach of such information.

88.    Defendant breached its respective duties to Plaintiff and Members of the Class under the FTC Act and HIPAA by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and the Class Members' Private Information.

89.    Defendant's violations of Section 5 of the FTC Act and HIPAA and its failure to comply with applicable laws and regulations constitutes negligence *per se*.

90.    But-for Defendant's wrongful and negligent breach of its duties owed to Plaintiff and the Class, Plaintiff and the Members of the Class would not have

been injured.

91.    As a direct, proximate, and traceable result of Defendant's negligence, negligence per se, and/or negligent supervision, Plaintiff and Members of the Class have suffered or will suffer injury and damages, including misuse and fraudulent activity, monetary damages, increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

92.    Defendant's breach of its duties to exercise reasonable care and its failures and negligence actually and proximately caused Plaintiff's and Members of the Class's actual, tangible, injury in fact and damages, including, without limitation, the theft of their Private Information by criminals, improper disclosure of their Private Information, lost benefit of their bargain, lost value of their Private Information, and lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted from and were caused by Defendant's negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

93.    The injury and harm suffered by Plaintiff and the Class Members were the reasonably foreseeable result of Defendant's breach of its duties. Defendant knew or should have known that Defendant was failing to meet its duties and that its breach would cause Plaintiff and Members of the Class to suffer the foreseeable

harms associated with the exposure of their Private Information.

## COUNT II
### THIRD PARTY BENEFICIARY
#### (on behalf of Plaintiffs and the Class)

94.    Plaintiff incorporates and realleges the above paragraphs as if fully set forth herein.

95.    Defendant contracted with its clients to provide them access to its software-as-a-service platform that included the collection and storage of vast quantities of Private Information about Plaintiff and the proposed Class Members.

96.    On information and belief, those contracts would have required business associate agreements, as is required by law, that require Defendant to comply with HIPAA's cybersecurity requirements, which are meant to protect Plaintiff and the proposed Class Members from the harms associated with the unlawful and unauthorized disclosure of such information.

97.    Rather than abide by its contractual obligations to reasonable protect this Private Information, Defendant breached those contracts by, among other things, failing to implement reasonable cybersecurity safeguards, as detailed above, necessary to identify malicious activity and notify security staff in time to prevent or minimize data theft. Indeed, Defendant did not even know malicious activity was occurring until after the data was already gone and the hackers made their presence

known by conducting a subsequent ransomware encryption attack and taking Defendant's systems offline.

98.    Plaintiff and Members of the Class have sustained damages because of Defendant's breaches of its agreements, as further enumerated above. Moreover, Plaintiff and the proposed Class now face a significantly increased risk of identity theft, financial fraud, and extortion that they must now face for years to come because of Defendant's brazen inaction and failures.

## COUNT III
## BREACH OF BAILMENT
### (on behalf of Plaintiffs and the Class)

99.    Plaintiff incorporates and realleges the above paragraphs as if fully set forth herein.

100.    Through its contracts with its clients, Defendant lawfully obtain Plaintiff's and the proposed Class Members' Private Information and was expected to safeguard the same and either destroy it or return it at the end of Defendant's business relationship with those clients.

101.    Rather than safeguard this Private Information as it was expected to do, Defendant failed to implement reasonable cybersecurity, as detailed above, or chose against spending the money to invest in such safeguards.

102.    Because of these failures, Defendant breached its bailment agreements

and thereby harmed Plaintiff and the proposed Class Members who reasonably expected that the service providers they allowed to have their Private Information would respect the confidentiality of that information and follow the legal requirements to reasonably safeguard it.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff James Kelly, individually, on behalf of his minor child L.K., and on behalf of all others similarly situated (the Class as heretofore identified) respectfully prays for judgment as follows:

A. Certification for this matter to proceed as a class action on behalf of the proposed Class under Fed. R. Civ. Proc. 23;

B. Designation of Plaintiff as Class Representatives and designation of the undersigned as Class Counsel;

C. Actual damages in an amount according to proof;

D. Injunctive or declaratory relief;

E. Pre- and post-judgment interest at the maximum rate permitted by applicable law;

F. Costs and disbursements assessed by Plaintiff in connection with this action, including reasonable attorneys' fees pursuant to O. C. G. A. § 13-6-11 and applicable law;

G.  For attorneys' fees under the common fund doctrine and all other

applicable law; and

H.  Such other relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, on behalf of himself, his minor child, and the Class, hereby demands

a trial by jury pursuant to Fed. R. Civ. Proc. 38(b) on all claims so triable.


Dated: September 6, 2024                    Respectfully submitted,

*/s/ Joseph B. Alonso*
Joseph B. Alonso
Georgia Bar No. 013627
Daniel H. Wirth
Georgia Bar No. 873443
**ALONSO WIRTH**
1708 Peachtree Street, Suite 303
Atlanta, GA 30309
(678) 928-4472
jalonso@alonsowirth.com

J. Gerard Stranch, IV*
Grayson Wells*
Miles Schiller*
**STRANCH, JENNINGS & GARVEY, PLLC**
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
 (615) 254-8801
gstranch@stranchlaw.com
gwells@stranchlaw.com
mschiller@stranchlaw.com

*Counsel for Plaintiff and the Proposed Class*

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1D, the attached pleading complies with the font and point selections prescribed by Local Rule 5.1B and uses 14 point Times New Roman.

*/s/ Joseph B. Alonso*
Joseph B. Alonso
Georgia Bar No. 013627

## CERTIFICATE OF SERVICE

It is hereby certified that on September 6, 2024, this Amended Complaint was filed via the CM/ECF system, which will electronically serve all counsel of record.

*/s/ Joseph B. Alonso*
Joseph B. Alonso
Georgia Bar No. 013627